STATE OF NORTH CAROLINA v. SHAWN WAYNE SCERCY, DEFENDANT

No. COA02-772

(Filed 5 August 2003)

1. **Criminal Law— preliminary instructions—expression of opinion**

The trial court did not express an opinion on defendant's guilt in a second-degree rape case when it stated, during preliminary instructions to the jury pool on the presumption of innocence and burden of proof, "and that's what we'll do—what will go on in this case," because although it is the better practice for a court to avoid even ambiguous comments that may imply that it and the prosecutor are on the same team, the court was merely commenting on the roles of the court and the attorneys in the trial which is not a question of fact to be decided by the jury.

STATE v. SCERCY

[159 N.C. App. 344 (2003)]

**2. Rape— second-degree—constructive force—sufficiency of evidence**

There was sufficient evidence of constructive force to support defendant's conviction of second-degree rape where the victim testified that defendant took her to an empty ballpark, threatened her by referring to a "9mm" that could be used to "persuade" her, and stated that he would get it the "easy way or the hard way."

**3. Criminal Law— instruction—false, contradictory, or conflicting statements—guilty conscience**

The trial court did not err in a second-degree rape case by instructing the jury that if it found defendant made false, contradictory, or conflicting statements, the same could be considered as a circumstance tending to reflect the mental process of a person possessed of a guilty conscience, because: (1) defendant's statements to the police and his testimony not only were inconsistent with each other, but were also inconsistent with the evidence at trial; and (2) the variances in the statements were consistent with the conclusion that defendant tailored his explanation to fit the allegations as defendant became aware of more details.

**4. Appeal and Error— preservation of issues—failure to object and argue in brief**

Although defendant contends the trial court committed plain error in a second-degree rape case by refusing to provide the jury with a written copy of the jury instructions after the jury requested it, defendant waived appellate review of this issue because defendant failed to object and to argue in his brief that the trial court's instruction amounted to plain error.

**5. Sentencing— miscalculation of prior conviction level—second-degree rape**

The trial court erred in a second-degree rape case by miscalculating defendant's prior conviction level as level II under N.C.G.S. § 15A-1340.14 and the case is remanded for resentencing because defendant had no other prior conviction with assigned points under the sentencing scheme, and the appropriate prior record sentencing level for defendant was level I.

Appeal by defendant from judgment entered 28 November 2001 by Judge Larry G. Ford in Rowan County Superior Court. Heard in the Court of Appeals 25 March 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Sarah Y. Meacham, for the State.*

*Daniel Shatz, for defendant-appellant.*

HUDSON, Judge.

Defendant Shawn Wayne Scercy was convicted of second-degree rape and sentenced to a prison term of 90 months to 117 months. He appealed, contending that the trial court (1) made preliminary remarks to the jury expressing an opinion regarding his guilt; (2) erred by denying his motion to dismiss; (3) erred by instructing the jury on false, contradictory, or conflicting statements; (4) erred in refusing to give the jury a written set of jury instructions; and (5) erred by sentencing defendant at prior record level II. We find no error in the trial but agree that the trial court erroneously sentenced defendant and accordingly remand the case for re-sentencing.

## BACKGROUND

The State's evidence at trial tended to show that on 21 February 1999, defendant and his brother drove to the home of Rebecca Lynn Claytor. Ms. Claytor testified at trial that she and defendant had known one another for most of their lives but that they had not seen each other for five or six years. Defendant and Ms. Claytor spoke on the porch until defendant suggested that they go to his car to talk. Ms. Claytor got in the front passenger seat, while defendant was in the driver's seat, and defendant's brother was in the back seat. Defendant asked Ms. Claytor to ride while he drove his brother home. At first she said she was busy, but defendant said that it would not take long, and Ms. Claytor agreed.

After dropping off the brother, defendant drove toward Ms. Claytor's home. He pulled over in a nearby ballpark. Ms. Claytor asked why they had stopped, and defendant told her he just wanted to talk some more. She agreed. Defendant then began to tell Ms. Claytor that he wanted to go out with her. Defendant was married but told Ms. Claytor that he and his wife had separated.

Defendant began to try to kiss and fondle Ms. Claytor. Ms. Claytor asked to be taken home. Defendant then asked Ms. Claytor to perform oral sex, but she refused. He continued to ask, and she

continued to say no. Ms. Claytor then tried to leave the car, but defendant reached across her to close the door. When she tried to leave again, he threatened her. Defendant told Ms. Claytor that if she did not do what he wanted, then he had a nine millimeter that would persuade her. He said it could be the easy way or the hard way, and defendant tapped the car console as he made this statement. Ms. Claytor believed that he was threatening her life.

At this point, defendant pulled out his penis and began to rub it. He also told Ms. Claytor to take off her shirt. She complied, and defendant pulled her over, pushed her head down, and forced her to perform fellatio. She stopped and began crying; defendant was upset and told her that he did not want to hear the baby stuff. He then came over to the passenger side of the car and told Ms. Claytor to pull down her pants so they could have sex. She continued to ask to go home. Defendant got on top of Ms. Claytor, pulled down her pants, and eventually succeeded in forcing himself upon her. Ms. Claytor repeated that she wanted to go home. Defendant then stopped, got off Ms. Claytor, and said that he did not know why he did it and that he was sorry. Defendant continued to apologize as he drove Ms. Claytor home. On returning home, Ms. Claytor told her mother about what had happened. Her mother called the police, and the two went to the hospital.

Detective David Miller interviewed Ms. Claytor at the hospital and took a written statement. Detective Richard Davis met Miller at the hospital and received information about the incident and Ms. Claytor's identification of defendant. Davis, along with two other deputies, located defendant at his mother's home on 22 February 2000. The officers took defendant into custody.

After the officers read him his rights, defendant provided a written statement. In that statement, he indicated that he and his brother had gone to Ms. Claytor's house and asked her to go for a ride. They took the brother home and then went to the China Grove basketball court. Defendant and Ms. Claytor sat and talked, and defendant asked Ms. Claytor to do something for him before he took her home. He said that she had removed her blouse and pants and performed fellatio at his request. She indicated that she needed to get home, but he persuaded her to have sexual intercourse. Defendant took Ms. Claytor back home where they talked for a few minutes, and he then left.

Detective Davis also took notes of comments defendant made while in custody. During a smoking break, defendant repeated his

description of visiting Ms. Claytor and taking her to the ballpark. Defendant told the detective that he knew why the police were asking him about a gun. Defendant then described how he told Ms. Claytor that he had something in the console of the car to put her in the mood. Defendant told Davis that he had wanted Ms. Claytor to believe that he had some liquor.

Defendant was taken to the magistrate's office and was present when Davis testified. Davis testified about Ms. Claytor's claim that defendant had threatened her with a nine millimeter gun and that defendant had said he would get it the easy way or the hard way. After hearing this testimony, defendant stated that "I did tell her I had a 9 . . . But I meant a 9 inch d—, not a 9 millimeter gun." Defendant also stated that Ms. Claytor had opened the car door but that she had closed it herself.

Defendant gave an additional written statement to Detective Miller on 1 March 1999. In that statement, defendant described again how his brother and he had stopped at Ms. Claytor's house and talked for a while before leaving to drop off the brother and go to the ballpark. Defendant and Ms. Claytor then started fooling around, and he was kissing and touching her. Ms. Claytor said that she needed to go home, but defendant tried to talk her into staying. She opened the car door, and defendant reached over and shut it. He told her, "Maybe this 9 millimeter will influence you," although defendant also told Miller that he never had had a gun. Defendant said that he had asked for oral sex and had told Ms. Claytor that he would take her home afterward. She agreed to take off her shirt and perform fellatio and then stopped and asked defendant to take her home. Defendant requested intercourse, and Ms. Claytor asked why he was doing this. He replied, "I didn't have anything to lose, I've done lost everything anyway." The two had intercourse, then defendant drove Ms. Claytor home. They talked for a few more minutes, and defendant left.

Defendant testified at trial that Ms. Claytor and he had "made out" on a prior occasion in 1996, where the two had kissed, and Ms. Claytor had removed most of her clothing. That was the last time that he saw her prior to 21 February 1999. On that date, defendant and his brother drove to Ms. Claytor's home where they talked in the car for a while. Defendant asked Ms. Claytor to ride with him to take his brother home, and she agreed. After dropping off the brother, defendant asked Ms. Claytor whether she wanted to ride up to the China Grove ballpark. Defendant eventually admitted to the alleged sexual activities but insisted that Ms. Claytor had agreed to them.

**STATE v. SCERCY**

[159 N.C. App. 344 (2003)]

Defendant was indicted for first-degree rape and first-degree sexual offense. At the close of the trial, in November 2001, the trial court dismissed the first-degree elements from both charges and submitted the case to the jury on second-degree rape and second-degree sexual offense. On 28 November 2001, the jury found defendant guilty of second-degree rape and not guilty of second-degree sexual offense. At sentencing, the court found that defendant had a prior record level of II and imposed an active sentence of 90 months to 117 months from the presumptive range. Defendant appeals.

ANALYSIS

A.

[1] Defendant argues first that the trial court erred by expressing an opinion regarding the defendant's guilt during the preliminary instructions to the jury. Defendant contends that the judge's comments gave the appearance that the judge had aligned himself with the prosecution and that the judge expected the defendant to be proven guilty beyond a reasonable doubt.

The contested remarks occurred as the trial court addressed the jury pool prior to the selection of jurors. The judge stated the following:

Now the defendant in this case has entered a plea of not guilty; under our system of justice—under our constitution; a defendant who pleads guilty is not required to prove his innocence but is presumed to be innocent. This presumption remains with the defendant throughout the trial until the jury selected to hear the case is convinced from the facts of the law beyond a reasonable doubt of the guilt of the defendant. Now, I can assure you these lawyers—as I told you are very competent, and I can assure you that Mrs. Biernacki does not object to this law; she willingly takes this burden of proving to you beyond a reasonable doubt. And that's what we'll do—what will go on in this case. The burden of proof is on the State to prove to you that the defendant is guilty beyond a reasonable doubt. A reasonable doubt is not a vain or fanciful doubt. It is a doubt based on reason and common sense arising out of some or all of the evidence that has been presented or the lack of insufficiency of the evidence, as the case may be. I can assure you that proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt, based upon your reason and common sense. Now, there is

no burden or duty of any kind on the defendant. There mere fact that the defendant's been charged with a crime is no evidence of guilt. A charge is merely the mechanical or administrative way by which any person can be brought to a trial. Now, if the State proves guilty beyond a reasonable doubt then the function of this jury by its verdict is to say, "Guilty." If the State fails to prove guilt or you have a reasonable doubt, then your function is to say, "Not guilty."

(emphasis added).

As set forth in N.C. Gen. Stat. § 15A-1222, the "judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." Moreover, trial judges "must be careful in what they say and do because a jury looks to the court for guidance and picks up the slightest intimation of an opinion. It does not matter whether the opinion of the trial judge is conveyed to the jury directly or indirectly as every defendant in a criminal case is entitled to a trial before an impartial judge and an unbiased jury." *State v. Jenkins*, 115 N.C. App. 520, 524-25, 445 S.E.2d 622, 625, *disc. review denied*, 337 N.C. 804, 449 S.E.2d 752 (1994) (citation and quotation marks omitted). "Whether the judge's comments, questions or actions constitute reversible error is a question to be considered in light of the factors and circumstances disclosed by the record, the burden of showing prejudice being upon the defendant." *State v. Blackstock*, 314 N.C. 232, 236, 333 S.E.2d 245, 248 (1985). "[I]n a criminal case it is only when the jury may reasonably infer from the evidence before it that the trial judge's action intimated an opinion as to a factual issue, the defendant's guilt, the weight of the evidence or a witness's credibility that prejudicial error results." *Id.*

In *Jenkins*, the defendant argued that the trial judge improperly expressed an opinion in the presence of the jury when the judge turned his back to the jury for 45 minutes during the defendant's testimony on direct examination. This Court agreed, holding that the jury could reasonably infer from the judge's action in turning his back that he did not believe the defendant's testimony to be credible. *Id.* at 525, 445 S.E.2d at 625. This action was especially prejudicial because the defendant had asserted consent as a defense, and his testimony and his credibility were crucial to that defense. "Although the trial court may have not intended to convey such a message, we must find error where the trial court's actions may speak directly to the guilt or innocence of the defendant." *Id.*

Here, however, we do not think that the trial judge's words to the jury pool spoke directly to the defendant's guilt or innocence. To the contrary, the judge's remarks are more aptly characterized as a description of the defendant's presumed innocence under the Constitution, as well as the State's obligation to prove its case. *State v. Hudson*, 54 N.C. App. 437, 441, 283 S.E.2d 561, 564 (1981) (holding that a court's comments on the roles that attorneys play in a criminal prosecution are not improper expressions of opinion as to the merits of either party's case). Although we do not condone the trial judge's use of the first person plural when he told the jury, "[a]nd that's what we'll do—what will go on in this case," we do not believe that the statement constituted an improper expression of opinion on a "question of fact to be decided by the jury." N.C.G.S. § 15A-1222. Although it is the better practice for a court to avoid even ambiguous comments that may imply that it and the prosecutor are a team, here we believe that the court was merely commenting on the roles of the court and the attorneys in the trial, which is not a question of fact to be decided by the jury. Accordingly, this argument is without merit.

B.

**[2]** Defendant argues next that the trial court erred in denying his motion to dismiss at the close of the evidence. Specifically, defendant contends that there was insufficient evidence of the element of force to support his conviction of second-degree rape.

In ruling on a defendant's motion to dismiss, "the trial court is to determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense." *State v. Cockerham*, 155 N.C. App. 729, 574 S.E.2d 694, 697 (citation and quotation marks omitted), *disc. review denied*, 357 N.C. 166, 580 S.E.2d 702 (2003). Whether the evidence presented constitutes substantial evidence is a question of law for the court. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation and quotation marks omitted). Our courts have repeatedly noted that "[t]he evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. . . ." *State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61 (1991) (citations omitted). "If all the evidence, taken together and viewed in the light most favor-

able to the State, amounts to substantial evidence of each and every element of the offense and of defendant's being the perpetrator of such offense, a motion to dismiss is properly denied." *Cockerham*, 155 N.C. App. at 733, 574 S.E.2d at 697. (citations and quotation marks omitted).

The elements of second-degree rape are that the defendant (1) engage in vaginal intercourse with the victim; (2) by force; and (3) against the victim's will. N.C. Gen. Stat. § 14-27.3.

Here, the State relied on evidence of constructive force. Constructive force, applied through fear, fright, or coercion, suffices to establish the element of force in second-degree rape. *State v. Etheridge*, 319 N.C. 34, 45, 352 S.E.2d 673, 680 (1987). It may be demonstrated by proof that the defendant acted so as, in the totality of the circumstances, to create the reasonable inference that the purpose of such acts was to compel the victim to submit to sexual intercourse. *Id.* At trial, the victim testified that defendant took her to an empty ballpark, threatened her by referring to a "9mm" that could be used to "persuade" her, and by further stating that he would get it the "easy way or the hard way." Defendant became angry when the victim refused to perform oral sex, and the victim repeatedly asked to be taken home. Under the circumstances, one could reasonably infer that defendant had both the intent and the means to harm Ms. Claytor if she did not submit to his demands, which evidence suffices to show constructive force. Thus, we conclude that the trial judge did not err in denying defendant's motion to dismiss on the basis of insufficiency of the evidence.

C.

[3] Defendant also contends that the trial court erred in instructing the jury that if it found defendant made false, contradictory, or conflicting statements, the same could be considered as a circumstance tending to reflect the mental process of a person possessed of a guilty conscience. The trial court gave the following instruction:

> Now, the State contends and the defendant denies that the defendant made false contradictory of [sic] conflicting statements. If you find that the defendant made such statements, they may be considered by you as a circumstance tending to reflect the mental process of a person possessed with a guilty conscience, seeking to divert suspicion or to exculpate himself and you should consider that evidence, along with all the other

believable evidence in this case; however, if you find that the defendant made such statements, they do not create a presumption of guilt and such evidence standing alone is not sufficient to a—establish guilt.

Our Supreme Court has held that false, contradictory, or conflicting statements made by an accused concerning the commission of a crime may be considered as a circumstance tending to reflect the mental processes of a person possessed of a guilty conscience seeking to divert suspicion and to exculpate himself. *E.g.*, *State v. Walker*, 332 N.C. 520, 537, 422 S.E.2d 716, 726 (1992), *cert. denied*, 508 U.S. 919, 124 L. Ed. 2d 271 (1993). The probative force of such evidence is that it tends to show consciousness of guilt. *State v. Myers*, 309 N.C. 78, 86, 305 S.E.2d 506, 511 (1983). The instruction is proper not only where defendant's own statements contradict each other but also where defendant's statements flatly contradict the relevant evidence. *Walker*, 332 N.C. at 538, 422 S.E.2d at 726.

In our view, the instruction was proper in this case because defendant's statements to the police and his testimony not only were inconsistent with each other but also were inconsistent with the evidence at trial. During the trial, the State introduced four prior statements that defendant had made to police. The statements consisted of a written statement made by defendant on 22 February 1999, a few hours after the alleged crime; defendant's oral statements made to Detective Davis during some smoking breaks that same day; defendant's oral statements made to Detective Davis after defendant was taken before the magistrate later that same morning; and a written statement signed by defendant during a police interview on 1 March 1999. These versions were inconsistent with each other and also conflicted with defendant's direct testimony and cross-examination at trial. For example, defendant's version of "persuading" the victim to have sex differed. In his first written statement, defendant described a consensual episode. Then, talking to Detective Davis, he tried to explain why the victim thought he had had a gun. Defendant told Davis that he said to the victim that "I had something, maybe I could persuade you or put you in the mood. . . . I have something in my console to persuade you, or get you in the mood or whatever." Defendant told Davis that he wanted the victim to believe that he had a liquor bottle. Then, after hearing the victim's description at the probable cause hearing of his threat to use a "9 millimeter," defendant admitted, "I did tell her I had a 9 . . . but I meant a 9 inch d---, not a 9 millimeter gun." Later, in his second written statement, defendant

explained that he told the victim that "Maybe this 9 millimeter will influence you." And, at trial, after hearing the victim's testimony that he had exposed himself, defendant testified that he had tried to persuade her by saying "Well, I got a 9 millimeter that might influence you," while exposing and stroking himself. The variances in the statements are consistent with the instruction—and the conclusion—that defendant tailored his explanation to fit the allegations as he became aware of more details.

We conclude that the trial court did not err in giving the challenged instruction.

## D.

**[4]** Defendant also argues that the trial court erred when it refused to provide the jury with a written copy of the jury instructions after the jury requested it. Again we disagree.

Here, the court charged the jury, which then retired to select a foreperson before going on a lunch break. Shortly after returning from the break, the jury sent a written request to the trial judge asking for "a copy of the 3 laws on the charge sheet." The judge did not provide a written copy; he explained that there was no timely way to print the charge from the court reporter's record and that his own copy was marked and included things that were inapplicable to the case. He did, however, offer to repeat the instructions as often as necessary and proceeded to re-instruct on the charges of second-degree rape and second-degree sexual offense.

Defendant did not object. Although in his assignment of error he "specifically and distinctly contended" pursuant to Rule 10(c)(4) of the Rules of Appellate Procedure that the error amounted to plain error, defendant failed to argue in his brief that the trial court's instruction amounted to plain error. N.C. R. App. P. 28(a). Accordingly, defendant has waived appellate review of this assignment of error. *State v. Nobles*, 350 N.C. 483, 516, 515 S.E.2d 885, 904 (1999).

## E.

**[5]** Lastly, defendant argues that the trial court miscalculated his prior conviction level pursuant to G.S. § 15A-1340.14. The State concedes the error, and thus we remand for re-sentencing at prior record level I.

Specifically, the court found that defendant had a prior conviction for misdemeanor financial card fraud, assigned one point for that

conviction, and classified defendant at prior record level II. Based upon a prior record level II, defendant was sentenced within the presumptive range for second-degree rape, 90 months to 117 months, pursuant to G.S. § 15A-1340.17.

According to the record, defendant had a prior conviction of misdemeanor financial card fraud at the time of sentencing. Pursuant to G.S. § 15A-1340.14(c), the classification of a prior offense is the classification assigned to that offense at the time the offense for which the defendant is being sentenced is committed. On 22 February 1999, the classification for misdemeanor financial card fraud was a class 2 misdemeanor. G.S. § 15A-1340.14(b) assigns zero points to a class 2 misdemeanor. Because defendant had no other prior conviction with assigned points under the sentencing scheme, the appropriate prior record sentencing level for defendant was level I.

Accordingly, we find no error in the trial but remand this case for re-sentencing.

No error at trial, remanded for resentencing.

Judges MARTIN and ELMORE concur.