726 S.E.2d 867 (2012)
In the Matter of T.W.
No. COA11-878.
Court of Appeals of North Carolina.
June 5, 2012.
*868 Attorney General Roy Cooper, by Special Deputy Attorney General Gail E. Dawson, for the State.
Leslie C. Rawls, Charlotte, for defendant-appellant.
GEER, Judge.
Juvenile T.W. was adjudicated delinquent based on his admission that he committed the offense of indecent liberties between minors and the trial court's finding that he committed three counts of second degree sexual offense and three counts of crimes against nature. On appeal, he argues that the trial court should have granted his motion to dismiss as to the three counts of second degree sexual offense because the State failed to prove the element of force required for that offense.
The State, in this case, did not rely on evidence of actual force, but rather argued that the evidence showed constructive force. Because, however, there was no evidence of any threat of force or any special relationship that would justify extension of the doctrine of constructive force to this case, we agree with the juvenile that the trial court erred in not granting the motion to dismiss as to the second degree sexual offense counts. The juvenile makes no argument regarding the crime against nature counts and, therefore, we affirm in part, reverse in part, and remand for entry of a new dispositional order.

Facts
This case arises from a series of sexual encounters between the juvenile, "Greg," and *869 two brothers, "Bill" and "Stan."[1] The juvenile admitted in a separate case to committing indecent liberties between children with another boy, "Tony."
At the adjudication hearing, the State's evidence tended to show the following facts. The juvenile and Greg met at a school for special needs children in Charlotte, North Carolina and subsequently became friends while taking karate at the same martial arts school. While the two of them were at the juvenile's parents' lake house, they had a conversation about secrets, and Greg admitted to the juvenile that he had been sexually abused four or five years earlier.
When the juvenile's father left the house to get pizza, the juvenile pressured Greg into changing out of his bathing suit in the same room as the juvenile. The boys continued to talk about secrets, and the juvenile told Greg that he and his male cousin had been experimenting sexually. The juvenile then convinced Greg to lie on his back with his eyes covered and to perform oral sex on the juvenile. The incident upset Greg.
Sexual encounters continued between Greg and the juvenile at both Greg's home and at the karate school. Greg's parents encouraged Greg to invite the juvenile over for Greg's 14th birthday. After Greg's parents went to bed, Greg performed oral sex on the juvenile without a blindfold.
The juvenile and Greg had more than 10 sexual encounters in the storage room of the karate school they both attended. Sometimes, Greg lay on his stomach, and the juvenile would rub his penis between Greg's crossed legs. Greg testified that he did not participate voluntarily  he did so because the juvenile told Greg that he would tell others about their sexual activities. Greg was also concerned that if his karate teacher learned about the encounters, Greg would lose some of the belts he had earned.
Greg currently attends a school on the west coast for special needs children. A social worker from Greg's new school testified as an expert in autism spectrum disorders. She explained that Greg suffers from a processing disorder that prevents him from understanding social interactions. Although he has a high verbal IQ, he does not always understand what he is saying or comprehend fully what is said to him. The expert testified that one effect of this disability was that once sexual abuse had occurred, Greg "would not know how to stop it, and he wouldn't have a skill to say no."
The juvenile also attended school with twin brothers, Bill and Stan. The student assistance coordinator testified that the juvenile had a strong influence over both Stan and Bill  the juvenile, who suffered from dyslexia, had above average intelligence and was a leader. Bill and Stan both came across as followers, and the juvenile was both more intelligent and mature than either Stan or Bill. The juvenile and the twin brothers also took karate together.
On one occasion, Stan, Bill, and the juvenile began playing "truth or dare" while at the juvenile's parents' lake house. The boys exchanged secrets. Stan and his brother Bill both admitted that they wet the bed. In return, the juvenile disclosed that when he was younger, he played "doctor" with his cousin, and the two of them touched each another's penises. Later, during that same night, the juvenile asked Stan if he would like to try what the juvenile had done with his cousin. Stan refused at first, but the juvenile told him that everyone did it, so Stan agreed.
The juvenile told Stan to lie down on the floor with his pants off, and the juvenile rubbed his penis on Stan's buttocks. Stan felt awkward and ashamed. Other encounters occurred at the juvenile's home, at Stan's house, and at the karate school. The juvenile performed fellatio on Stan five times.
The sexual encounters between the boys continued for approximately two years. Stan wanted to stop, but continued to participate because the juvenile told Stan he would tell his secret about wetting the bed and make his karate teacher and all his friends turn *870 against him. Stan became progressively more angry and withdrawn because he felt the juvenile was controlling his life. When asked whether the juvenile ever threatened to physically harm him or did in fact physically harm him, Stan said "no."
After the truth or dare session at the lake house, the juvenile also persuaded Bill to have a sexual encounter. As he did with Stan, the juvenile had Bill lie down, and the juvenile rubbed his penis between Bill's crossed legs. When the boys returned home, Bill and the juvenile had additional sexual contact. The juvenile would sometimes perform fellatio on Bill.
During the first couple of sexual encounters, Bill felt as though he had a choice as to whether to participate. As time went on, however, Bill began to feel that what they were doing was not right. When Bill told the juvenile that he did not want to participate anymore, the juvenile threatened to tell the secret Bill had revealed at the lake house. Bill was also afraid that the juvenile would turn his karate teacher and friends against him. The juvenile did not use physical force to get Bill to continue with the sexual activities between them.
Tony also took karate with the juvenile. Tony was both younger and smaller than the juvenile. Sometime near the end of 2008 or in 2009, the juvenile asked Tony if he could share a secret with him. The juvenile indicated that he wanted to share sexual knowledge with Tony. At some point after that conversation, when the juvenile and Tony were taking out the trash at the karate studio, the juvenile told Tony he wanted to show him what sperm looked like. The juvenile then exposed his genitals to Tony and squeezed sperm from his penis. Although Tony thought it was odd, Tony did not tell anyone because the juvenile said it was a secret.
On another occasion, the juvenile pulled down his pants, had Tony do the same, and rubbed his penis against Tony's buttocks. On yet another occasion, the juvenile showed Tony sperm in the storage room of the karate studio. The juvenile touched Tony's penis at least one time out by the trash cans at the karate studio.
When the juvenile told Greg that he had been engaging in sexual acts with Tony, Greg decided that he needed to tell an adult what had been going because Greg thought Tony was too young. The juvenile had also told Greg that he was engaging in similar activities with Bill and Stan, so Greg alerted the brothers that he was going to tell their karate teacher.
The juvenile was adjudicated delinquent on 14 January 2011 based on his admission to the offense of indecent liberties between children and on the court's finding that he committed three counts of second degree sexual offense, and three counts of crimes against nature. The trial court entered a Level 2 disposition imposing 14 days suspended confinement and 12 months probation. The juvenile timely appealed to this Court.

Discussion
The juvenile contends that the trial court erred in denying his motion to dismiss the counts of second degree sexual offense. "We review a trial court's denial of a [juvenile's] motion to dismiss de novo." In re S.M.S., 196 N.C.App. 170, 171, 675 S.E.2d 44, 45 (2009). "Where the juvenile moves to dismiss, the trial court must determine whether there is substantial evidence (1) of each essential element of the offense charged,... and (2) of [the juvenile's] being the perpetrator of such offense." In re Heil, 145 N.C.App. 24, 28, 550 S.E.2d 815, 819 (2001) (internal quotation marks omitted). "The evidence must be such that, when it is viewed in the light most favorable to the State, it is sufficient to raise more than a suspicion or possibility of the respondent's guilt." In re Walker, 83 N.C.App. 46, 48, 348 S.E.2d 823, 824 (1986).
The juvenile was alleged to be delinquent in this case under N.C. Gen.Stat. § 14-27.5 (2011), which provides in relevant part:
(a) A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person:
(1) By force and against the will of the other person[.]
N.C. Gen.Stat. § 14-27.1(4) (2011) defines "`[s]exual act'" as including fellatio. See *871 State v. Jacobs, 128 N.C.App. 559, 563, 495 S.E.2d 757, 760 (1998) ("Fellatio is included as a sexual act within the meaning of the statute.")
The juvenile acknowledges that the State presented evidence of fellatio performed on Greg, Stan, and Bill, but argues that the State failed to prove the element of force. Our Supreme Court had held with respect to second degree sexual offense:
The phrase "by force and against the will of the other person" means the same as it did at common law when it was used to describe an element of rape. The requisite force may be established either by actual, physical force or by constructive force in the form of fear, fright, or coercion. Constructive force is demonstrated by proof of threats or other actions by the defendant which compel the victim's submission to sexual acts. Threats need not be explicit so long as the totality of circumstances allows a reasonable inference that such compulsion was the unspoken purpose of the threat.
State v. Etheridge, 319 N.C. 34, 45, 352 S.E.2d 673, 680 (1987) (internal citations and parentheticals omitted).
The State has not argued that evidence exists of actual physical force. Rather, the State contends that constructive force was shown by (1) the juvenile's threatening Greg, Stan, and Bill with exposure of their innermost secrets and their participation with him in sexual activities, and (2) the power differential between the juvenile and the other boys.
The State has cited no authority holding that threats of exposure as opposed to threats of physical harm are sufficient for constructive force, and we have found none. In State v. Raines, 72 N.C.App. 300, 324 S.E.2d 279 (1985), this Court addressed constructive force in the absence of a threat of physical harm and, at least, implicitly held that for constructive force to exist, the threats must be threats of physical harm.
In Raines, after noting that the "by force and against the will" language in the sexual offense statute means the same as it did under the common law for rape, this Court then observed that "[a]t common law, fear, fright, or coercion could take the place of actual physical force, or, as stated by our Supreme Court: `A threat of serious bodily harm, which reasonably induces fear thereof, constitutes the requisite force and negates consent.'" Id. at 303-04, 324 S.E.2d at 282 (quoting State v. Burns, 287 N.C. 102, 116, 214 S.E.2d 56, 65 (1975)). The Court then pointed to the holding in State v. Locklear, 304 N.C. 534, 284 S.E.2d 500 (1981), that "`actual physical force is not required'" and that "`[f]ear of serious bodily harm reasonably engendered by threats or other actions of a defendant and which causes the victim to consent to the sexual act takes the place of force and negates the consent.'" Raines, 72 N.C.App. at 304, 324 S.E.2d at 282 (quoting Locklear, 304 N.C. at 540, 284 S.E.2d at 503). The Court referred to the holdings in Burns and Locklear as a "long-revered definition of constructive force." Id.
The Court continued by observing that this definition combined with the lack of evidence of threats of physical harm explained the prosecution's decision in Raines not to rely on constructive force, but rather to argue that the sexual touching itself constituted physical force. Id. The Court concluded: "The State obviously realized that fear, fright, or coercion must be reasonably induced before it can replace actual physical force. Indeed, in every constructive force case cited by the district attorney at trial, there was, at least, a threat of physical force, and, in most of the cases, there was actual physical force which preceded or constituted the threat that further force would follow if the victim would not succumb." Id.
The Court ultimately held that the trial court should have granted the motion to dismiss the sexual offense charges because "there was neither the threat of physical force nor any actual force preceding or constituting a threat." Id. Although this Court was not as explicit in Raines as it could have been, we believe that the opinion can only be read as holding that for the concept of constructive force to apply, the threats resulting in fear, fright, or coercion must be threats of physical harm. See also State v. Scercy, 159 N.C.App. 344, 352, 583 S.E.2d 339, 344 (2003) *872 (holding that trial court properly denied motion to dismiss when "[u]nder the circumstances, one could reasonably infer that defendant had both the intent and the means to harm [the victim] if she did not submit to his demands, which evidence suffices to show constructive force").
Accordingly, given Raines and the lack of any authority otherwise, we hold that the juvenile's threats to Greg, Stan, and Bill were not sufficient to constitute constructive force because they did not place the boys in fear of physical harm. The State, however, argues alternatively that we should extend the reasoning in Etheridge and hold that the nature of the relationship between the juvenile and the other boys  with his dominance over them  is sufficient to satisfy the constructive force requirements.
In Etheridge, our Supreme Court considered whether the State had presented adequate evidence of force for purposes of second degree sexual offense when a father engaged in sexual acts with his son and daughter. 319 N.C. at 44-45, 352 S.E.2d at 680. The Court held "that constructive force could be reasonably inferred from the circumstances surrounding the parent-child relationship in [that] case." Id. at 47, 352 S.E.2d at 681.
The Court pointed out that "[t]he incidents of abuse all occurred while the boy lived as an unemancipated minor in defendant's household, subject to defendant's parental authority and threats of disciplinary action." Id. at 47-48, 352 S.E.2d at 681. The Court then observed that explicit threats were unnecessary because
a father's threat to impose punishment upon a child who refuses to obey his commands need not be stated in so many words. The child's knowledge of his father's power may alone induce fear sufficient to overcome his will to resist, and the child may acquiesce rather than risk his father's wrath. As one commentator observes, force can be understood in some contexts as the power one need not use. Estrich, Rape, 95 Yale L.J. 1087, 1115 (1986).
In such cases the parent wields authority as another assailant might wield a weapon. The authority itself intimidates; the implicit threat to exercise it coerces. Coercion, as stated above, is a form of constructive force. For this reason, we hold that the state presented sufficient evidence from which the jury could reasonably infer that defendant used his position of power to force his son's participation in sexual acts.
Id. at 48, 352 S.E.2d at 681-82.
Our courts have not extended Etheridge's constructive force analysis to relationships apart from those resembling the parent-child relationship. See, e.g., State v. Corbett, 154 N.C.App. 713, 717, 573 S.E.2d 210, 213 (2002) ("During the dates in question, [the victim] was ages twelve through sixteen and was not emancipated and was subject to defendant's parental authority [as step-father]. From the circumstances of the parental relationship, we find there is sufficient evidence from which a reasonable jury could conclude defendant used his position of power to force his stepdaughter to engage in sexual acts."). While other non-familial relationships might involve a dynamic similar enough to the one in Etheridge to warrant a finding of constructive force, the relationships in this case do not.
Here, the perpetrator and the victims are all minors of similar ages who also all suffer from some degree of cognitive difficulties. The relationship of a leader to a follower among children in school simply does not involve the same wielding of authority, disparity of power, and degree of fear that occurs between an abusive parent and a child. We hold Etheridge does not apply.
Therefore, the State failed to prove either actual force or constructive force in connection with the second degree sexual offense counts. As the juvenile does not challenge his admission of the offense of indecent liberties between children or the trial court's determination that he committed crimes against nature, we uphold the remainder of the trial court's adjudication order. We remand, however, for entry of a new disposition order.
*873 Affirmed in part; reversed and remanded in part.
Judges ROBERT C. HUNTER and ROBERT N. HUNTER, JR. concur.
NOTES
[1] The pseudonyms "Greg," "Bill," "Stan," and "Tony" are used throughout this opinion for the privacy of the juveniles and for ease of reading.